## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

**STATE OF FLORIDA,**

                    **Plaintiff,**

**v.**

**UNITED STATES FISH AND WILDLIFE SERVICE**

      **and**

**GAIL CARMODY** *in her official capacity as Field Supervisor, United States Fish and Wildlife Service, Panama City Field Office,*

                    **Defendants.**

**CASE NO.** 4:06cv410 - RH/WCS

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The State of Florida ("Florida" or the "State") hereby states its complaint and prays for relief as follows:

## PRELIMINARY STATEMENT

1.      This action seeks review of a biological opinion issued September 5, 2006 by the United States Fish and Wildlife Service ("FWS" or the "Service") concluding consultation with the United States Army Corps of Engineers ("Corps") pursuant to Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.

2.      The biological opinion ("BiOp") addresses the impact of certain Corps reservoir operations in the Apalachicola-Chattahoochee-Flint ("ACF") River Basin on the threatened Gulf sturgeon, an anadromous fish species, and two species of freshwater mussel, the endangered fat threeridge and the threatened purple bankclimber (collectively the "Apalachicola River Species"), all of which inhabit the Apalachicola River in Florida and are protected under the

ESA. The BiOp also addresses the impact of Corps operations on critical habitat that has been designated for the Gulf sturgeon and that has been proposed for the mussel species.

3. The BiOp concludes that the Corps' "Interim Operations Plan" ("IOP") is not likely to "jeopardize" the continued existence of these species or "adversely modify" their critical habitat, despite causing significant adverse effects to an already highly degraded environmental baseline, aggravating some of the very conditions that led to these species' original listing under the ESA and undermining the most important objectives of the Service's recovery plans for these species. The Service's analysis violates the most basic standards of rational decision making and fails to meet the ESA's core purposes of preventing extinction and facilitating species recovery.

4. This action challenges the BiOp because it, *inter alia*, (a) arbitrarily and capriciously concludes that listed species will not be jeopardized and that critical habitat will not be adversely modified by the IOP; (b) ignores the best scientific and commercial data available, fails to consider relevant factors and runs counter to the evidence available in the record; (c) improperly segregates from its analysis the baseline condition and the impact of "cumulative effects" when determining whether the IOP will jeopardize listed species or adversely modify critical habitat; (d) fails to impose "reasonable and prudent alternatives" that are adequate in substance and timing to avoid jeopardizing the Apalachicola River Species and adversely modifying critical habitat; (e) arbitrarily and capriciously concludes that Gulf sturgeon eggs will not be "taken" by the IOP; and (f) fails to impose "reasonable and prudent measures" or "terms and conditions" that are adequate in substance and timing to minimize the impact (i.e., amount or extent) of the taking of individual members of the mussel species and to avoid jeopardizing those species.

2

5.     This action seeks a declaration that the BiOp's "no-jeopardy" and "no-adverse modification" findings, the BiOp's "no take" finding for Gulf sturgeon, and accompanying "incidental take statement" ("ITS") for mussels, violate ESA Section 7, 16 U.S.C. § 1536 and FWS's consultation regulations at 50 C.F.R. Part 402, and are arbitrary, capricious, an abuse of discretion and not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).   This action also seeks an injunction directing FWS to withdraw the BiOp and rescind the ITS, and to prepare a new BiOp that complies fully with the requirements of the ESA.

## PARTIES

6.     Plaintiff Florida brings this action in its sovereign capacity as a State, with rights to the waters of the ACF Basin, and sovereign and proprietary interests in the fish and wildlife within its borders.   Florida has a fiduciary duty as trustee of the State's waters and natural resources to conserve and protect the waters and natural resources in the State, including her threatened and endangered species and their associated habitats.

7.     Florida is doing its part to achieve the ecosystem-based conservation objectives Congress identified in the ESA.   *See* 16 U.S.C. §1531(b).   Florida adopted, for example, a comprehensive plan for coordinated watershed management in the Apalachicola River Basin. Among the plan's major objectives is preserving the existing ecosystem through conserving habitats, especially those unique or critical habitats on which threatened and endangered species rely.   In addition to enhancing species protection through regulation, Florida purchased over 280,000 acres to preserve and protect key parts of the Apalachicola River and Bay ecosystem, representing the State's largest land acquisition in any Florida river system.

3

8.      Florida has sought for many years to encourage the consultation process that resulted in the BiOp. The BiOp is, in fact, the result of a consultation initiated by the Corps in response to a motion for preliminary injunction filed by Florida in January 2006. *See Alabama v. U.S. Army Corps of Eng'rs*, 2006 WL 2106991 (N.D. Ala. July 25, 2006). That litigation was limited to the Corps' procedural obligation to consult in the first instance under Section 7(a)(2) and Corps operations pending completion of the consultation. Neither the Defendants in this action, nor the final agency action challenged here, were ever a subject of that earlier action.

9.      During the term of the consultation, Florida has been extensively involved in the development of biological and hydrologic data concerning the needs of the Apalachicola River Species and the impact of the IOP on those species and their habitats. Some of those data have been developed in coordination with FWS, while other data developed independently by Florida, have been shared with FWS. Much of those data are discussed (and some are misapplied or ignored) in the BiOp. Florida has submitted multiple comments, some formal and some informal, to FWS concerning the consultation process and the impact of the IOP on the Apalachicola River Species. Florida repeatedly provided data and other technical support during the consultation process at FWS' request.

10.      Defendant FWS is an agency of the United States Department of the Interior and is responsible for administering the provisions of the ESA with regard to the threatened and endangered species and critical habitats that are the subject of this action.

11.      Defendant Gail Carmody is sued in her official capacity as the Field Supervisor of FWS' Field Office, which issued the BiOp. On information and belief, Ms. Carmody oversaw production of the BiOp and is directly responsible for its contents and conclusions.

## JURISDICTION AND VENUE

4

12.   This Court has jurisdiction under 5 U.S.C. §§ 701-706 (Administrative Procedure Act), 28 U.S.C. § 1331 (federal question), § 2201 (declaratory judgment), and § 2202 (injunctive relief).

13.   Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to Florida's claims occurred here. Defendant FWS's Field Office is in this district. That office, and Defendant Carmody in particular, is responsible for production of the BiOp. Moreover, the subject matter of the BiOp, the Apalachicola River Species and their critical habitats, are located in this district.

### STATUTORY FRAMEWORK

14.   The ESA is intended "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, ... ." 16 U.S.C. § 1531(b).

15.   Under ESA Section 7(a)(2), "[e]ach federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ." 16 U.S.C. § 1536(a)(2).

16.   An agency action is "likely to jeopardize the continued existence of" a species if the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

17.   According to FWS' consultation regulations, an agency action destroys or adversely modifies critical habitat if the action "appreciably diminishes the value of critical

habitat for both the survival and recovery of a listed species." *Id.* This definition of adverse modification, however, has been held unlawful in other courts because it does not account fully for the important role critical habitat plays in species conservation. *See Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059 (9th Cir 2004) and *Sierra Club v. U.S. Fish and Wildlife Service et al.,* 245 F.3d 434 (5th Cir 2001) (notably, involving the Gulf sturgeon). FWS has since adopted a "national policy" that evaluates whether adverse modification is occurring based, in part, on the ability of critical habitat to remain functional "to serve the intended conservation role for the species." 71 Fed. Reg. 32,745, 32,764 (June 6, 2006).

18.     Under the ESA, "'conservation' mean[s] to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). This definition is similar to FWS' definition of recovery, which "means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02.

19.     Section 9 of the ESA prohibits "take" of listed species by anyone, including federal agencies. 16 U.S.C. § 1538. "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19). FWS has defined "harm" to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

20.     In addition to its substantive mandates, Section 7 establishes an interagency consultation process to assist federal agencies in complying with their duty to avoid jeopardy to

listed species or destruction or adverse modification of critical habitat. *See* 50 C.F.R. Part 402. This case involves "formal consultation" in which FWS is ultimately responsible for determining whether the IOP will avoid jeopardy and adverse modification of critical habitat. 50 C.F.R. § 402.14(h)(3).

21.    In formulating its biological opinion, FWS must evaluate the "effects of the action" together with "cumulative effects" on the listed species. 50 C.F.R. §§ 402.14(g)(3)-(4). This multi-step analysis requires FWS to consider: a) the direct, indirect, interrelated and interdependent effects of the proposed action; b) the "environmental baseline," to which the proposed action will be added; and c) any cumulative effects - "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation," 50 C.F.R. § 402.02 (definitions).   In the end, FWS' biological opinion must determine "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).

22.    In rendering its biological opinion (and in formulating all elements thereof), FWS must rely solely on the "best scientific and commercial data available." 16 U.S.C. § 402.14(g)(8). If such data are unavailable, then FWS must "develop the biological opinion with the available information giving the benefit of the doubt to the species."  Final Section 7 Consultation Handbook (1998) ("Handbook") 1-6. *See also id.* ("The Services are then expected to provide the benefit of the doubt to the species concerned with respect to such gaps in the information base (H.R. Conf. Rep. No. 697, 96th Cong., 2nd Sess. 12 (1979)).").

23.    If, based upon an analysis of these factors, FWS concludes that the proposed action is likely to jeopardize a listed species, or destroy or adversely modify its critical habitat,

FWS must identify and describe any reasonable and prudent alternative ("RPA") to the proposed action that it believes would avoid jeopardy and adverse modification. 16 U.S.C. §1536(b)(3)(A). The effects of an RPA must be analyzed under the same section 7 framework (described above) as an action proposed by an action agency. Finally, if FWS believes there is no reasonable and prudent alternative to the proposed action, its biological opinion must so state. 50 C.F.R. § 402.14(h)(3).

24.    Even if FWS reaches a no-jeopardy/no-adverse modification finding for either a proposed action or a reasonable and prudent alternative course of action, it must still issue an ITS for any take of a listed species that is likely to occur as a consequence of those actions that avoid jeopardy and adverse modification. 50 C.F.R. § 402.14(i).   Take of listed species that is consistent with an ITS is not subject to the prohibition against take in section 9 of the ESA. However, the ITS must minimize the impact of the take on the species by including reasonable and prudent measures ("RPM") and mandatory terms and conditions ("T&C") designed to implement the RPMs.  50 C.F.R. § 402.14(i)(ii) and (iv).

25.    Under ESA section 7(a)(1), federal agencies also must use their authorities to further the purposes of the Act by carrying out programs for the conservation of listed species. 15 U.S.C. § 1536(a)(1). As a part of its responsibility in preparing a biological opinion, FWS may set forth any conservation recommendations it believes will be necessary to comply with section 7(a)(1). 50 C.F.R. § 402.14(j).

26.    Section 7(a)(4) of the ESA requires Federal agencies to confer with FWS on any action that is likely to result in destruction or adverse modification of critical habitat that has been proposed but not finalized.  Under conference procedures, the Service may provide advisory conservation recommendations to assist the Corps in eliminating conflicts that may be

caused by the IOP.  Conference opinions on proposed critical habitat are typically prepared according to 50 C.F.R. § 402.14, as if the proposed critical habitat were designated.  FWS may adopt a conference opinion as its final biological opinion when the critical habitat is designated, if no substantial new information or changes in the action alter the content of the opinion.  50 C.F.R. § 402.10(d).

27.    The APA authorizes courts reviewing agency action to hold unlawful and set aside agency action, findings and conclusions that are arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Biological opinions issued pursuant to Section 7 of the ESA are final agency actions and are reviewable under the APA. *See, e.g., Bennett v. Spear,* 520 U.S. 154, 175 (1997).

## FACTUAL BACKGROUND

28.    The Apalachicola River is formed by the confluence of the Chattahoochee and Flint Rivers.  These systems converge at Lake Seminole, which is operated by the Corps.   In terms of volume, the Apalachicola River is the largest river in Florida, discharging an average of approximately 26,380 cubic feet per second ("cfs") into the Apalachicola Bay and estuary system.  Flows in the River currently range from a minimum of 5,000 to a maximum of 200,000 cfs. The Apalachicola derives most of its flow from the Flint and Chattahoochee river basins in Georgia.

### *Status of the Apalachicola River Species*

#### The Gulf Sturgeon and Its Designated Critical Habitat

29.    In 1991, the Service listed the Gulf sturgeon as "threatened" under the ESA.  56 Fed. Reg. 49,653 (Sept. 30, 1991).  Dams constructed and operated by the Corps in the ACF Basin have blocked sturgeon access to migration routes and historic spawning areas.   When

listing the Gulf sturgeon, the Service observed that the "Federal actions most likely to affect the Gulf sturgeon are the permitting programs and Federal water resource projects of the U.S. Army Corps of Engineers." 56 Fed. Reg. at 49,656.

30.     The Service later designated the Apalachicola River as critical habitat for the Gulf sturgeon.  68 Fed. Reg. 13,370 (March 19, 2003).   Gulf sturgeon critical habitat includes the Apalachicola River system and its distributaries (*i.e.*, outflowing branches of the River), which along with other critical habitat units "collectively represent habitat necessary to provide for the conservation of the species."  68 Fed. Reg. at 13,388.  Designated critical habitat also includes portions of the Apalachicola Bay in the Gulf of Mexico.  68 Fed. Reg. at 13,397.

31.     The primary constituent elements of Gulf sturgeon critical habitat include:

> (4) A flow regime (i.e., the magnitude, frequency, duration, seasonality, and rate-of-change of fresh water discharge over time) necessary for normal behavior, growth, and survival of all life stages in the riverine environment, including migration, breeding site selection, courtship, egg fertilization, resting, and staging, and for maintaining spawning sites in suitable condition for egg attachment, egg sheltering, resting, and larval staging;

68 Fed. Reg. at 13,389.

32.     In the Gulf Sturgeon Recovery Plan ("GSRP"), FWS explained that "spawning habitats should receive maximum protection from disturbance." GSRP at 51.   Specifically, "protection of spawning habitats of the Apalachicola River would include the upper 20 km (12.4 mi) of the river and its surrounding basin components." *Id.*  This area later was designated as part of critical habitat "Unit 6." 68 Fed. Reg. at 13,393.

33.     In designating Gulf sturgeon critical habitat, FWS determined that: "[T]he value of critical habitat is appreciably diminished when an action considerably reduces the capability of designated or proposed critical habitat to satisfy requirements essential to the conservation of a listed species."  68 Fed. Reg. at 13,380.  Actions that may destroy or adversely modify Gulf

10

sturgeon critical habitat include, but are not limited to, water impoundment, water diversion and dam operations. 68 Fed. Reg. at 13,380. FWS previously acknowledged that such activities include: "(4) Actions that would alter the flow regime (the magnitude, frequency, duration, seasonality, and rate-of-change of fresh water discharge over time) of a riverine critical habitat unit such that it is appreciably impaired for the purposes of Gulf sturgeon migration, resting, staging, breeding site selection, courtship, egg fertilization, egg deposition, and egg development, such as impoundment; water diversion; and dam operations." 68 Fed. Reg. at 13,399.

34.     Florida recently provided FWS with a report authored by Dr. Bill Pine (University of Florida Department of Fisheries and Aquatic Sciences) for the Florida Fish and Wildlife Conservation Commission. *An Assessment of Gulf Sturgeon Movement, Spawning Site Selection, and Post-Spawn Holding Areas in the Apalachicola River, Florida* (Aug. 14, 2006). That report documents activity during Spring 2006 at known spawning sites below Jim Woodruff Lock and Dam. Spawning occurred at the "main Chattahoochee shoals" (HS01) from April 5 through May 1, 2006. Fertilized eggs were not collected until water temperatures exceeded 20°C and ended near 25°C (Table 5). Depths at which eggs were collected were a minimum of 1.8m with velocities over the substrate of 0.75m/s ± 0.15m/s.

### The Mussel Species and Their Proposed Critical Habitat

35.     The Service listed the fat threeridge as endangered and the purple bankclimber as threatened under the ESA in 1998. Both species occupy the Apalachicola River. 63 Fed. Reg. 12,664 (March 16, 1998). The Service explained previously that this species was experiencing "limited recruitment at the site representing its best known population." 63 Fed. Reg. at 12,667. FWS found that Federal actions impacting water quantity were among the factors that may affect

11

these species and their habitat.  63 Fed. Reg. at 12,684.  The Service emphasized that because these species' distribution had become so restricted, any adverse modification of occupied mussel habitat "would likely jeopardize their continued existence." *Id*.

36.    In 2003, FWS published a Recovery Plan for the mussels with the specific goal of restoring viable populations within a significant portion of their historical ranges "to the point where their protection under the ESA is no longer required." According to the Recovery Plan, "securing the existing subpopulations of the [] species and their habitats is the most important and urgent" objective for achieving recovery "because of the extent of their decline and continuing threats to their habitats." Once the viability of the extant subpopulations is secured, "the next objective is to increase the number of subpopulations and extend their range." *Recovery Plan for Endangered Fat Threeridge, Shinyrayed Pocketbook, Gulf Moccasinshell, Oval Pigtoe and Threatened Chipola Slabshell, and Purple Bankclimber* (2003) at iii.

37.    The Service did not designate critical habitat for these two mussels when the species were listed.  However, as a result of a lawsuit filed March 15, 2004, the Service revisited that decision in June 2006.   71 Fed. Reg. 32,746 (June 6, 2006).   FWS has proposed critical habitat in most of the Apalachicola River mainstem and many of the key distributaries of the River, including Swift Slough.  According to FWS, "[t]he construction and operation of dams, water withdrawals, and water diversions may alter features of the flow regime important to the mussels and their host fishes." 71 Fed. Reg. at 32,759.

38.    The "primary constituent elements" of proposed mussel critical habitat are:

> (1) A geomorphically stable stream channel (a channel that maintains its lateral dimensions, longitudinal profile, and spatial pattern over time without an aggrading or degrading bed elevation); (2) A predominantly sand, gravel, and/or cobble stream substrate;  (3) Permanently flowing water;  (4) Water quality (including temperature, turbidity, dissolved  oxygen, and chemical

12

constituents) that meets or exceeds the current aquatic life criteria established under the Clean Water Act (33 U.S.C. 1251-1387); and (5) Fish hosts (such as largemouth bass, sailfin shiner, brown darter) that support the larval life stages of the seven mussels.

71 Fed. Reg. at 32,757.

### *The Impact of Corps Operations on the Apalachicola River Species*

39.     Congress authorized the Corps to develop and operate certain dam and reservoir projects within the ACF Basin, subject to the requirements of specific statutes and regulations. Among these projects are the following: Buford Dam is located on the Chattahoochee River about 35 miles northeast of Atlanta, Georgia, and impounds Lake Sidney Lanier; West Point Dam is located on the Chattahoochee River downstream of Atlanta on the boundary between Georgia and Alabama, and impounds West Point Lake; Walter F. George Lock and Dam are located on the Chattahoochee River along the border between Alabama and Georgia, and impound Walter F. George Lake; the George W. Andrews Lock and Dam are located on the Chattahoochee River directly south of the Walter F. George Lock and Dam, and impound Lake George W. Andrews on the border between Alabama and Georgia; Jim Woodruff Lock and Dam are located immediately downstream of the confluence of the Chattahoochee and Flint Rivers and impound Lake Seminole near the border between Georgia and Florida, which releases water into the Apalachicola River.

40.     Congress authorized Buford Dam and Lake Sydney Lanier for the primary purposes of flood control, hydropower and downstream flow maintenance. *See* Rivers and Harbors Act of 1945, Pub. L. No. 79 14, 59 Stat. 10 (1945); Rivers and Harbors Act of 1946, Pub. L. No. 79 525, 60 Stat. 634 (1946); H.R. Doc. No. 342, 76th Cong., 1st Sess. (1939); H.R. Doc. No. 300, 80th Cong., 1st Sess. (1947). *See also Alabama v. U.S. Army Corps of Eng's,* 424 F.3d 1117, 1122 (11th Cir. 2005) (explaining only flood control, navigation and hydropower are

13

"explicitly authorized purposes"); *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1247 n.1 (11th Cir. 2002). Congress allocated only minimal storage in Lake Lanier for municipal and industrial water supply. Nevertheless, "the Corps has historically maintained that water supply use is an 'incidental benefit' flowing from the creation of the reservoir." *Alabama*, 424 F.3d at 1122. Under that theory, since the 1950s, the Corps authorized or facilitated, through contract or practice, the withdrawal and release of large volumes of water for municipal and industrial purposes from Lake Lanier for the benefit of municipal water suppliers in the vicinity of Atlanta, Georgia. Under the IOP, the Corps manages its reservoirs to retain water in storage for the benefit of these municipal and industrial suppliers.

41. The Corps exercises discretionary control over the amount of water that is retained in the upstream reservoirs, and the ESA, therefore, applies to the Corps' decisions regarding how much water remains in storage and how much is released for downstream needs. *See In re Operation of the Missouri River System Litigation*, 421 F.3d 618, 631 (8th Cir. 2005) ("Because the Corps is able to exercise its discretion in determining how best to fulfill the purposes of the reservoir system's enabling statute [the Flood Control Act], the operation of the reservoir system is subject to the requirements of the ESA."). See also, *id.* at 626 ("The [Corps'] operation of the reservoir system also brings the Corps within the provisions of the [ESA].").

42. The Service informed the Corps as early as April 2000 of concerns about the adverse impacts of Corps reservoir operations on the Apalachicola River Species. In August 2000, the Corps knew that some sloughs occupied by protected mussels had been dewatered, or that the water level within them had been significantly lowered, by releases from Jim Woodruff Lock and Dam of 5,000 cubic feet per second ("cfs"). The Corps observed significant numbers

14

of dead mussels in dewatered tributaries and sloughs along the River. The fat threeridge and purple bankclimber were among the species harmed.

43.    In April 2002, the Corps reduced releases from Jim Woodruff Lock and Dam during the spring fish spawn on the Apalachicola River. As a result of reduced flows on the River below the dam, as in 2000, fish spawning beds were dewatered and sloughs and tributaries were disconnected. Several rock ledges located below the dam (suspected to serve as spawning habitat for the Gulf sturgeon) were dewatered and exposed during periods when the sturgeon was likely in spawn.

44.    In June 2002, the Service reiterated its belief to the Corps that formal Section 7 consultation should not be delayed further. The Service later informed the Corps that "operations under the present drought appear to us to have the potential for take." The Service explained that the Corps' operations were likely adversely impacting the Gulf sturgeon in several ways, including the destruction of sturgeon eggs or larvae following spawning and interrupting or precluding spawning by modifying the depth of water over the few rock ledges at which spawning occurs.

45.    Despite FWS' admonition, the Corps steadfastly refused to enter into formal consultation with FWS for years, instead deferring to an *ad-hoc*, loose-knit string of informal meetings to discuss specific operations during low-flow conditions. Finally, however, as a result of Florida's seeking a preliminary injunction to compel it, the Corps initiated formal consultation before ever responding to Florida's injunction request.

***The Corps' Decision to Consult on the IOP and its Resulting Effects this Summer***

46.    On March 7, 2006, by letter of the same date ("Consultation Letter"), the Corps initiated formal consultation with FWS concerning "existing operations from Jim Woodruff Lock and Dam" which took the form of the IOP.

47.    The IOP is based on dam operations that are keyed to "Basin Inflow." Various amounts of water are released from the Corps reservoirs (or stored for the benefit of upstream uses) based on the amount of Basin Inflow the Corps calculates in the ACF Basin at any given time. Basin Inflow is calculated based on the volume of water entering the Corps' reservoirs from the Chattahoochee and Flint Rivers (i.e., after upstream water withdrawals have occurred). Thus, the extent of water withdrawals (from either groundwater or surface water) in the ACF River Basin bears directly on the Corps' operations under the IOP. Those withdrawals reduce the amount of water available to the Apalachicola River Species because, simply put, the higher the withdrawals, the less water is available in the Corps' reservoirs. Thus, "Basin Inflow" as used by the Corps actually is the net amount of water available after subtracting upstream depletions from the total inflow to the Basin.

48.    The Corps' letter included a description of the IOP. Of greatest concern to Florida is the flow regime that results from adherence to the IOP as observed this year. In summary, under the IOP (as revised June 12, 2006), from June - February, the Corps will operate as follows: a) When Basin Inflow is 5,000 cfs or less, the Corps would release such water from storage as is necessary to maintain an average flow at the Chattahoochee gage of 5,000 cfs; b) When Basin Inflow is between 5,000 cfs and 8,000 cfs, the Corps would pass to the River 100% of Basin Inflow; c) When Basin Inflow is between 8,000 cfs and 23,000 cfs, the Corps would pass 70% of Basin Inflow, but not less than 8,000 cfs; d) When Basin Inflow is greater than

23,000 cfs, the Corps would pass not less than 16,000 cfs, but could refill the reservoirs without limitation.

49.      Notwithstanding the foregoing, from March through May, the Corps will operate as follows: a) When Basin Inflow is 5,000 cfs or less, the Corps would release such water from storage as is necessary to maintain an average flow at the Chattahoochee gage of 5,000 cfs; b) When Basin Inflow is between 5,000 cfs and 20,400 cfs, the Corps would pass to the River 100% of Basin Inflow; c) When Basin Inflow is between 20,400 cfs and 37,400 cfs, the Corps would pass 70%-90% (most likely 70%) of Basin Inflow, but not less than 20,400 cfs; d) When Basin Inflow is greater than 37,400 cfs, the Corps would pass not less than 37,400 cfs.

50.      The consultation package also included a series of "Enclosures" that provided data supporting the consultation request.  Among these were Enclosure 29, which correlated various flows in the Apalachicola River to the amount of inundated Gulf sturgeon spawning habitat that has been designated as critical habitat by FWS.  The Corps "mapped data at the rock ledge [critical] habitat below Jim Woodruff Dam" to determine flows required to inundate that critical habitat to a depth of 4.59 feet, the minimum depth then known to support Gulf sturgeon spawning.  Consultation Letter at 9.

51.      The Corps concluded flows of 30,000 cfs are required to fully inundate Gulf sturgeon critical habitat to proper spawning depth.  *Id.*  Similarly, the Corps found that at flows of 16,000 cfs, spawning habitat will be exposed to the atmosphere as water levels decline.   At a release of 20,400 cfs, the Corps has found that 26% of the designated critical habitat below Jim Woodruff Lock and Dam will not be inundated to a sufficient spawning depth and will be unsuitable for Gulf sturgeon spawning.  Consultation Letter at 9.

17

52.     Adherence to the IOP this spring resulted in the lowering of water levels over substantial amounts of designated Gulf sturgeon spawning habitat below Jim Woodruff Lock and Dam during the spawning period. As a result, much of the area was inaccessible to Gulf sturgeon that would otherwise have occupied that habitat and laid eggs there. At various times, approximately 50% of all Gulf sturgeon spawning habitat was made unavailable by lowered releases called for under the IOP. In addition, approximately 15% of the habitat was completely out of the water, exposing any eggs that might have been laid in those locations.

53.     The Corps' Enclosures also included data and studies that had been conducted by the Corps concerning the impact of the IOP on the listed mussels. Among those studies were Enclosures 7 and 32, both of which found that the listed mussel species would be adversely impacted by flow reduction in the Apalachicola River below 8,000 cfs. In the Consultation Letter, the Corps acknowledged that "impacts to protected mussels may potentially occur whenever flows are less than 8,000 cfs." *Id.* at 19. The Corps explained that "… a significant percentage of listed mussel species occur at substrate depths that may be exposed by flows between 5,000 and 7,000 cfs." Moreover, the Corps "estimated that at NM 73.3 the following percentages of A. neislerii [fat threeridge] would be exposed at reduced discharge: 49.1% (6,000 cfs), 53.9% (5,000 cfs), 67.9% (4,000) cfs, and 85.4% (3,000 cfs)."

54.     The Corps data were generally consistent with findings by Florida biologists, who evaluated the status of listed mussels and their habitats in the Apalachicola River in late 2005. Those findings, which were provided to the Service earlier this year, indicated that significant mussel populations would be adversely impacted by flows lower than 8,000 cfs.

55.     Over the course of the past summer, the Corps attempted to operate in conformance with the IOP. When the Corps reduced flows precipitously from 8,000 cfs to just

18

over 5,000 cfs, Florida observed significant mussel mortality in the mainstem of the Apalachicola River and in other important habitats, including Swift Slough. Florida, accordingly sought, and obtained a temporary restraining order against the Corps requiring it to increase releases to the River. As a result of subsequent agreement, the Corps maintained higher releases in the Apalachicola River than called for in the IOP during a 4 week period.

56.     The agreement was set to expire after the Service issued the BiOp, which was scheduled to be released initially on July 21, 2006. Immediately after the agreement was secured, the Corps announced that the consultation would be continued until September 5, 2006. When the agreement expired on July 24, 2006, the Corps resumed operations under the IOP. Although Florida sought an additional temporary restraining order to again raise flows in the Apalachicola River, this time, Florida was unsuccessful. Thus, since July 24, 2006, the Corps has been operating under the IOP.

57.     Implementation of the IOP over the past six weeks has had a particularly adverse impact on occupied habitats once connected to the mainstem of the Apalachicola River. "Swift Slough" (one of the main sloughs that are part of FWS' proposed critical habitat designation) contains a core population of up to 30,000 individual fat threeridge mussels. Defendant Carmody, in sworn testimony, has called this one of the "highest density fat threeridge mussels beds (sic) known." Declaration of Gail Carmody ¶ 5(f) filed in *Alabama v. U.S. Army Corps of Eng'rs*, CV 90 BE-1331-E (D. Ala.).

58.     For the first time in recorded history, Swift Slough has been disconnected from the mainstem of the Apalachicola River as a result of the Corps maintaining flows of just 5,000 cfs in the Apalachicola River (as measured at the Chattahoochee gage, which is below Jim Woodruff Lock and Dam) under the IOP. Mussel mortality rates in Swift Slough were as high

19

as 30% at the end of July 2006 and are likely higher today.  Defendant Carmody accompanied Florida biologists on a visit to Swift Slough at the end of July and witnessed first-hand the disconnection of Swift Slough and the ensuing death of mussels in the slough.

59.     When Swift Slough became disconnected, the Corps was releasing only enough water from upstream reservoirs to maintain a flow of 5,000 cfs in the River.  The converse of water release is water retention.  At the same time the Corps was releasing 5,000 cfs to the Apalachicola River, the Corps was retaining water in the upstream reservoirs that could have been used to mitigate the adverse impacts being experienced along the Apalachicola River.

60.     FWS previously explained with regard to the mussels:

> ... the Service has applied an analytical framework for jeopardy analyses of the seven mussels that relies heavily on the importance of core area populations to the mussels' survival and recovery. The section 7(a)(2) analysis is focused not only on these populations but also on the habitat conditions necessary to support them. ... Generally, if a proposed Federal action is incompatible with the viability of the affected core area population(s), inclusive of associated habitat conditions, a jeopardy finding is considered to be warranted, because of the relationship of each core area population to the survival and recovery of the species as a whole.

71 Fed. Reg. at 32,764.  In its BiOP, FWS discounts the disconnection of Swift Slough as an anomalous event not significant in relation to the mussel species.

61.     Operations under the IOP will regularly exterminate populations that successfully repopulate higher areas in wet periods (such as those inhabiting areas between 5,000 cfs and 8,000 cfs, which were repopulated since the drought of 2000).  "Fluctuations in a species' population over time can affect significantly the probability of its extinction."  Handbook 4-21. In fact, "an action increasing a species' population variability may affect the continued existence of the species more significantly than a reduction in population size."  *Id.*

62.     FWS has explained: "Pursuant to current national policy and the statutory provisions of the Act, destruction or adverse modification is determined on the basis of whether, with implementation of the proposed Federal action, the affected critical habitat would remain functional (or retain the current ability for the [primary constituent elements of critical habitat] to be functionally established) to serve the intended conservation role for the species." 71 Fed. Reg. at 32,764.   According to FWS: "Generally, the conservation role of the seven mussels' critical habitat units is to support viable core area populations." 71 Fed. Reg. at 32,765.

63.     Among the significant number of mussels that have died in Swift Slough this year as a result of flow reductions pursuant to the IOP are specimens approximately 80 years old. These older individuals are critically important to the species to which they belong because of the important role they likely play in reproduction.   These individuals, which survived Corps operations in earlier drought years (2000 and 2002), have died and will not be available to repopulate Swift Slough or other portions of the River.  The net effect of losing these important members of the Swift Slough population is that the overall species has become younger and less reproductively capable.   Such "life history variables" as longevity, age distribution and recruitment all are expressly relevant to the jeopardy analysis.  Handbook at 4-20.  "The size of a population and its natural variance over time are important characteristics affecting the species' response to disturbance factors." *Id.*

64.     The impacts of the IOP are exacerbated by dramatic changes experienced by the Apalachicola River ecosystem as a result of anthropogenic activities in the ACF Basin.  The River channel has incised significantly, a problem that is particularly acute in the upper Apalachicola River.    In addition, due to a combination of upstream consumption, dam

21

construction and dam operation, the River is now experiencing more frequent low flow years and lower minimum flows during those years.

65.     The net effect of the aforementioned changes in River morphology and hydrology in the ACF Basin has been to reduce dramatically the area of available habitat inundated (and thus made available to the species, and in the case of mussels, their host fish) at various flows. Today, more water is required to inundate the same habitats that previously were inundated at lower flows. More water is required to protect the Apalachicola River Species and their habitats than was required, for example, in 2000, when releases of 5,000 cfs from Jim Woodruff Lock and Dam maintained a connection between Swift Slough and the Apalachicola River.

66.     Some of the most dramatic changes have occurred in the upper portions of the River, which support documented Gulf sturgeon spawning activities. Notably, the United States Geological Survey ("USGS") has concluded that it now takes approximately 10,000 cfs more water in the upper River reaches to inundate the same amount of habitat that otherwise would have been required in the pre-dam era.

67.     The USGS has concluded that Swift Slough, the location of a very significant mussel population, requires not less than 5,600 cfs flow (as measured at the Chattahoochee gage downstream of Jim Woodruff Lock and Dam) to remain minimally connected to the main channel of the Apalachicola River under current conditions. During extended periods of low flow, the amount of flow at Chattahoochee required to connect Swift Slough can be as much as several hundred cfs higher.

### *FWS' Issuance of the BiOp*

68.     FWS issued the BiOp on September 5, 2006. Remarkably and inexplicably, the BiOp concludes that the IOP will not likely jeopardize any listed species and will not appreciably

diminish the value of critical habitat for these species. Therefore, the BiOp does not include an RPA to the IOP.

69.     The BiOp concludes that the IOP will not result in take of Gulf sturgeon.  The BiOp, therefore, includes no ITS for Gulf sturgeon.

70.     The BiOp does, however, conclude that the IOP will result in incidental take of mussels and, therefore, contains an ITS that authorizes the Corps to take, primarily through habitat modification, individual mussels.

71.     In reaching its conclusions, the Service segregates from its analysis the baseline condition and cumulative effect of upstream water depletions, rather than aggregating those effects and the effects of the IOP.  The Service thereby attributes little, if any, adverse impact of Corps activities to the IOP.

## FIRST CLAIM FOR RELIEF

### *Unreasonable Finding of No Jeopardy*

72.     Plaintiff incorporates by reference all preceding paragraphs.

73.     The ESA requires FWS to review federal agency actions to determine if they are likely to jeopardize the continued existence of any endangered or threatened species using the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2).

74.     The consultation regulations require FWS to determine whether the proposed action, *taken together with* the cumulative effects, *when added to* the environmental baseline, is likely to jeopardize the continued existence of listed species. 50 C.F.R. §§ 402.02, 402.14(g).

75.     FWS's conclusion that the proposed action is not likely to jeopardize the continued existence of the Gulf sturgeon, the fat threeridge or the purple bankclimber is

arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and the consultation regulations and has no basis in the BiOp or anywhere else in the administrative record.

76.     FWS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## SECOND CLAIM FOR RELIEF

*Unreasonable Finding of No Destruction or Adverse Modification of Critical Habitat*

77.     Plaintiff incorporates by reference all preceding paragraphs.

78.     ESA Section 7(a)(2) requires FWS to ensure that a project will not "result in the destruction or adverse modification of [the designated critical] habitat" of a listed species, using the best scientific and commercial data available.  16 U.S.C. § 1536(a)(2)

79.     The consultation regulations require FWS to determine whether the proposed action, *taken together with* the cumulative effects, *when added to* the environmental baseline, is likely to adversely modify critical habitat. 50 C.F.R. §§ 402.02, 402.14(g).

80.     That assessment must take into account, among other factors, the impact of the IOP on the value of critical habitat to continue serving the conservation (i.e., recovery) goal of the ESA.

81.     FWS's conclusion that the proposed action is not likely to result in the destruction or adverse modification of critical habitat is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and the consultation regulations and has no basis in the BiOp or anywhere else in the administrative record.

82.    FWS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## THIRD CLAIM FOR RELIEF

### *Failure to Include an RPA that Will Avoid Jeopardy and Adverse Modification*

83.    Plaintiff incorporates by reference all preceding paragraphs.

84.    The Service is obligated under Section 7(a)(2) to assist federal agencies in insuring that their actions do not violate Section 7(a)(2) by jeopardizing listed species or adversely modifying their critical habitat.

85.    By virtue of the actions giving rise to Florida's First and Second Claims for Relief, FWS concluded that it need not provide an RPA that would avoid jeopardy and adverse modification.  These determinations were unlawful.  FWS's consequent failure to include an RPA in the BiOP is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and the consultation regulations.

86.    FWS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## FOURTH CLAIM FOR RELIEF

### *Unreasonable Finding that Gulf Sturgeon Will Not be Taken*

87.    Plaintiff incorporates by reference all preceding paragraphs.

88.     The BiOp unreasonably concludes that Gulf Sturgeon will not be taken, despite the fact that the IOP allows the Corps to retain water upstream during the Gulf sturgeon spawn and to reduce Apalachicola River flows to the point that eggs may be exposed.

89.     FWS's failure to find take is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and the consultation regulations.

90.     FWS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## FIFTH CLAIM FOR RELIEF

### *Failure to Include in the ITS Reasonable and Prudent Measures and Terms and Conditions That Minimize the Impact of Take and Avoid Jeopardy*

91.     Plaintiff incorporates by reference all preceding paragraphs.

92.     When it issues an ITS, the Service is required to include RPMs that minimize take.  In addition, the ITS, itself, must not have the effect of jeopardizing listed species that are the subject of the ITS.

93.     The BiOp unreasonably discounts the effect of authorized takings on the mussel species as a whole.  It authorizes the repeated decimation of at least one core population of mussels (Swift Slough) without adequately considering the importance of that population to the species as a whole.

94.     The ITS contains inadequate RPMs concerning the flow regime maintained under the IOP.  The ITS does not contain T&C that adequately minimize the impact of take on the mussel species. The Service has failed to articulate any basis on which one can conclude that the ITS itself will not result in jeopardy to the Apalachicola River Species.

95.    In formulating its ITS, therefore, FWS acted in a manner that is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and FWS's consultation regulations.

96.    FWS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## SIXTH CLAIM FOR RELIEF

### *Failure to Employ the Best Scientific and Commercial Data Available*

97.    In rendering a biological opinion, FWS must rely solely on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

98.    In rendering the BiOp, the Service ignored or did not properly account for, *inter alia*: (a) the dramatic changes in geomorphology experienced by the Apalachicola River since the Corps dams were constructed as articulated by the USGS, (b) the impact of upstream depletions on Basin Inflow to the ACF reservoir system and, thus, the amount of water that could be provided under the IOP absent those depletions, (c) data provided by Florida bearing on the needs of the Apalachicola River Species, and (d) the actual observed impacts of operations under the IOP in 2006.

99.    In formulating its BiOP, therefore, FWS acted in a manner that is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and the consultation regulations.

100.    FWS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

27

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that the Court:

1.      Adjudge and declare that FWS has violated ESA Section 7 and its implementing regulations by making a no-jeopardy/no-adverse modification finding for the Apalachicola River Species, and a "no take" finding for Gulf sturgeon, in the BiOp for the IOP that is arbitrary, capricious, an abuse of discretion and contrary to law;

2.      Enjoin FWS to withdraw the BiOp and ITS for the IOP, notify the Corps that the BiOp and ITS have been withdrawn, and prepare a BiOp and ITS that complies with the requirements of the ESA;

3.      Retain jurisdiction over this matter until Defendants have fully complied with the Court's order;

4.      Award plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys fees, associated with this litigation; and,

5.      Grant plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this  day of September, 2006.

CHARLES J. CRIST, JR.
ATTORNEY GENERAL

Lou Huebner
Acting Solicitor General
Jonathan A. Glogau
Special Counsel
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
Fax: (850) 410-2672

By _____
Christopher M. Kise
FOLEY & LARDNER LLP
106 East College Avenue, Suite 900
Tallahassee, FL 32301
Tel. (850) 222-6100
Fax. (850) 561-6475

BLACKWELL SANDERS PEPER MARTIN LLP
Donald G. Blankenau (Nebraska No. 18528)
Thomas R. Wilmoth (Nebraska No. 22518)
206 South 13th Street, Suite 1400
Lincoln, NE 68508
Tel: (402) 458-1500
Fax: (402) 458-1510

HOGAN & HARTSON LLP
James T. Banks
Parker Thomson
1111 Brickell Ave., Suite 1900
Miami, FL 33131
Tel. (305) 459-6613
Fax (305) 459-6550

Attorneys for Plaintiff State of Florida